33 P.3d 828

STATE of Idaho, Plaintiff–Respondent,

v.

Christopher C. TAPP, Defendant–
Appellant.

No. 25295.

Court of Appeals of Idaho.

July 20, 2001.

Review Denied Oct. 29, 2001.

Ronaldo A. Coulter, State Appellate Public Defender; Sara B. Thomas, Deputy Appellate Public Defender, Boise, for appellant. Sara B. Thomas argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

LANSING, Judge.

Christopher C. Tapp appeals from his conviction for first degree murder and rape. Tapp argues that the district court erred by not suppressing the statements he made in a series of police interviews. In the alternative, he contends the sentences imposed are excessive.

## I.

### FACTS AND PROCEDURAL HISTORY

Early in the morning of June 13, 1996, Angie Dodge was raped and stabbed to death in her apartment in Idaho Falls. On January 7, 1997, twenty-year-old Christopher Tapp voluntarily submitted to police questioning about this crime at the Law Enforcement Building (LEB) in Idaho Falls. Tapp again voluntarily went to the LEB for questioning on January 10. After this interview, Tapp's parents retained private counsel for their son. When Tapp did not appear at the LEB for another scheduled interview on January 11, police officers went to his home to find him. They were informed by Tapp's mother that an attorney had been retained and that Tapp would appear on January 13, with counsel, to answer more questions. Approximately an hour later, the Idaho Falls chief of police arrived at the Tapp home and attempted to convince Tapp's mother to change her mind about her son's refusal to be interviewed without assistance of counsel. She refused. Rather than waiting for a voluntary interview on January 13, law enforcement officials obtained a warrant to arrest Tapp on a charge of accessory to a felony, Idaho Code §§ 18–205, –206, and he was arrested on January 11.

After making the arrest, an officer put Tapp in an interview room and called Tapp's attorney. Before the attorney's arrival, the officer initiated a discussion with Tapp about the type of information the police wanted to

obtain from him.[1] On January 13, another attorney joined in Tapp's representation as co-counsel. Thereafter, Tapp was interviewed, while under arrest and in police custody, on January 15 and 17. During all interviews at the LEB from January 15 forward, Tapp was separated from his attorneys. The attorneys were placed in a nearby office in the LEB where they were allowed to observe the interviews on a closed-circuit television. Tapp's only contact with his attorneys was during breaks in the interviews. His attorneys apparently made no objection to this arrangement.

In the first few interviews Tapp denied having any knowledge of the crime, then claimed that Ben Hobbs had confessed to killing Dodge and had asked Tapp to help him with an alibi. Tapp denied having ever been at the crime scene. By January 15 and 17, however, Tapp's story was changing, and he admitted that he had accompanied Hobbs to Dodge's apartment on the night of the murder. Tapp told police that Hobbs wanted to confront Dodge because Hobbs believed that she had convinced Hobbs's wife to leave him. Tapp claimed that Hobbs and Dodge started fighting and that Hobbs punched Dodge and then stabbed her twice. Tapp asserted that he ran from the apartment at that point. He admitted that he returned later and found Dodge dead and no one else present. Tapp also implicated a man named Jeremy Sargis in the crime. Tapp said he believed that the murder weapon belonged to Sargis, but he initially claimed that Sargis was not in the apartment that night. Eventually, however, Tapp accused Sargis of helping to rape and murder Dodge.

On January 15, Tapp and the State entered into a "limited use immunity" agreement, and on January 17 they entered into a "cooperation and settlement agreement." These agreements (hereinafter referred to collectively as the "immunity agreements") required Tapp to cooperate with the police investigation of Dodge's death and to provide the police with truthful information about the crime. Tapp also agreed to plead guilty to

---

1. Tapp's statements made during this interview before the arrival of his counsel were later sup-

pressed by the district court and are not at issue in this appeal.

358

aiding and abetting an aggravated battery, a felony, I.C. §§ 18–903, –907, and the State agreed not to file any other charge against Tapp related to Dodge's death. The State also promised to recommend at the sentencing hearing that the district court retain jurisdiction for a limited period pursuant to I.C. § 19–2601(4), and to allow withdrawal of the guilty plea if the judge did not follow the recommendation. The State also agreed not to use any of Tapp's statements against him except for impeachment purposes. As a consequence of the immunity agreements, the pending charge against Tapp for accessory to a felony was dismissed on January 17 and he was released from custody.

Tapp was again questioned on January 18 and 29. Before the January 29 interview began, the prosecutor informed Tapp and his attorney that the prosecutor considered the immunity agreements with Tapp to be void because Tapp had not been truthful in describing the crime. The prosecutor explained that Tapp's contention that Hobbs and Sargis were the rapists was contradicted by DNA tests showing that semen found on Dodge's body and clothing did not come from either of those men (or from Tapp). Despite this declaration from the prosecutor, Tapp and one of his attorneys continued with the January 29 interview. On that date, Tapp was given a polygraph test, during which he asked to be taken to the apartment where the murder occurred. Tapp's attorney agreed that the police could take Tapp to the crime scene for further questioning, but the attorney declined to accompany Tapp and the officers. Once at the crime scene, Tapp made statements implicating himself in the crimes. At the crime scene and later the same day at the LEB, Tapp admitted that he had held Dodge's arms and shoulders down throughout the rape and stabbing. In his new account of the events, Jeremy Sargis was replaced by a different male whose name Tapp could not remember. Some details of his story about how Dodge was raped and details of other events of that night changed during this and two subsequent interviews.

Tapp was rearrested after the January 29 interview. The next day, he was again charged with being an accessory to a felony. Tapp was further interviewed on January 30

and 31. On February 3, 1997, charges of rape, I.C. § 18–6101(3), (4), and first degree murder, I.C. §§ 18–4001, –4002, –4003(a), replaced the accessory charge.

Tapp moved to suppress the statements that he made to police on the grounds that his right to counsel was violated during police interviews, that his statements to police were involuntary, and that the immunity agreements were still binding on the State. Before this motion was decided, Tapp's original attorneys withdrew and other attorneys were appointed to represent him. The district court denied the suppression motion except as to statements made on January 11 after Tapp was arrested and before his attorney's arrival.

A jury trial ensued, and Tapp was found guilty of first degree murder and rape. The State's case was based almost entirely upon Tapp's confessions to having helped other men rape and murder Dodge; no physical evidence linked Tapp to the crime. At sentencing, the district court rejected the State's request for the death penalty and instead imposed a unified sentence of life plus fifteen years' imprisonment with a thirty-year minimum term for first degree murder and a concurrent unified twenty-year sentence with a ten-year minimum term for rape.

On appeal, Tapp argues that his statements should have been suppressed for a number of reasons. He asserts that the prosecution's use of Tapp's statements given to police violated the immunity agreements of January 15 and 17, which included clauses precluding the State from using Tapp's statements against him, that his right to counsel under the Fifth and Sixth Amendments was violated, and that the use of his statements violated due process because they were involuntarily given. In the event that his conviction is upheld, Tapp also argues that the sentences imposed are excessive. We address each of these claims in turn.

## II.

## ANALYSIS

### A. Suppression Motion

#### 1. Immunity agreements

Tapp argues that by prosecuting him for rape and murder and utilizing in that prose-

cution the statements that Tapp gave to the police, the prosecutor violated the immunity agreements. The State responds that it was relieved of its obligations under the agreements because Tapp himself breached the agreements by giving false information to the police.

As noted above, in the immunity agreements the State made various concessions which included refraining from the use of Tapp's statements against him except for impeachment purposes. These concessions were made by the State in exchange for Tapp's agreement to "cooperate" with the State in its investigation of Dodge's death. The immunity agreements defined "cooperation" to mean:

> Providing truthful information to law enforcement officials through interviews and to be conducted at reasonable times and places with proper notice, including giving statements under oath and subject to the penalty of perjury for any false statements made therein. More particularly, the defendant agrees to provide information to the State and its investigative agencies in connection with the physical injuries to and death of Angie Dodge.

> a. Agrees to provide complete and detailed information concerning the names and roles of certain persons known or suspected by him to be involved in these crimes, including Ben Hobbs.

The agreements further specified consequences if this standard of cooperation was not met by Tapp as follows:

> In the event that Christopher Conley Tapp refuses to cooperate as specified above, this agreement shall become null and void and any information obtained as a result of his cooperation prior to his refusal to cooperate may, in such instance, be used against Christopher Conley Tapp by virtue of his refusal for further cooperation.... It is the understanding of the defendant that if he violates any of the terms of this agreement, the State shall not be bound by this agreement. Upon the defendant's breach of the agreement, the State shall be free to file or refile any

and all charges that it can prove against the defendant....

Tapp argues that the district court erred in holding that the prosecutor was justified in deeming the immunity agreements to be void and unenforceable once the prosecutor learned that DNA test results contradicted what Tapp had told authorities about the identity of the men who participated in the rape. According to Tapp, the State did not prove that he had breached the immunity agreement because it did not prove that Hobbs and Sargis were not involved in Dodge's murder.

■ In reviewing a claim for breach of an immunity agreement, we apply much the same standards that are utilized in the interpretation and enforcement of contracts in civil cases. The trial court's factual findings are accepted unless they are clearly erroneous, but whether the facts as found establish a breach of the agreement is a question of law reviewed *de novo*. *State v. Barnett*, 133 Idaho 231, 234, 985 P.2d 111, 114 (1999). *See also United States v. Plummer*, 941 F.2d 799, 803 (9th Cir.1991).

■ We are in agreement with the district court that the State adequately proved that Tapp materially breached the immunity agreements. At the time the agreements were made, Tapp had told police that he, Hobbs, and Sargis were the three men who were present when Dodge was raped and killed; he had mentioned no other participant. Tapp said that Hobbs and Sargis were the only actors in the crimes. However, when DNA tests were conducted on semen found on Dodge's leg and sweatpants, and semen that was mixed with Dodge's blood on a blanket, the results showed that the DNA did not match Hobbs, Sargis or Tapp. This evidence showed that there was at least one other man who played a major role in the crime whose presence and identity Tapp had not revealed. Even if, as Tapp later claimed, he does not know the name of the unidentified participant, his concealment of the participation of another person in the crime breached his obligation under the agreements to provide "complete and detailed information" about the persons involved in the offenses. The immunity agreements provid-

ed that they would be null and void, and the State would not be further bound, if Tapp breached the obligation of cooperation. Therefore, the district court correctly held that the State was relieved of its duty of performance. The prosecution's subsequent use against Tapp of statements he made to police did not violate the immunity agreements.

## 2. Fifth Amendment right to counsel

We next must consider Tapp's argument that the technique of separating him from his attorneys during interrogations at the LEB violated his Fifth Amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In order to safeguard the Fifth Amendment privilege against self-incrimination, in *Miranda* the United States Supreme Court held that persons subjected to custodial interrogation must be advised of certain rights, including the right to private or appointed counsel, and that the police must terminate the interrogation if the accused requests the assistance of an attorney. *Id.* at 444–45, 86 S.Ct. at 1612–13, 16 L.Ed.2d at 707–07. *See also Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Michigan v. Tucker*, 417 U.S. 433, 443–44, 94 S.Ct. 2357, 2363–64, 41 L.Ed.2d 182, 192–93 (1974). Building upon *Miranda*, in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that once the accused requests the assistance of an attorney, the custodial interrogation must stop immediately and may not resume "until counsel has been made available to him, unless the accused himself initiates further communication...." *Id.* at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. Tapp contends that this constitutional safeguard was violated when, after Tapp advised police that he wished the assistance of private counsel, the police conducted interrogations while his attorneys were not present in the same room but were in a nearby office observing the interview over closed circuit television.

▪ We conclude that Tapp's challenge to this interrogation technique is well taken. *Miranda* itself states that "the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel *present* during any questioning if the defendant so desires." *Miranda*, 384 U.S. at 470, 86 S.Ct. at 1626, 16 L.Ed.2d at 721. (Emphasis added.) In a subsequent decision, *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Supreme Court considered whether the right to counsel delineated in *Miranda* and *Edwards* was satisfied when, after the suspect invoked his right to counsel and an appointed attorney had consulted with the suspect, police resumed interrogating the suspect in the attorney's absence. The Supreme Court rejected the notion that because counsel had been made available to the suspect after he invoked the right to counsel and before questioning resumed, his right to counsel was adequately honored. The requirement that an attorney be "made available" to the accused, the Court said, "refers to more than an opportunity to consult with an attorney outside the interrogation room." *Id.* at 152, 111 S.Ct. at 490, 112 L.Ed.2d at 497. The Court further explained:

> In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.
>
> . . . .
>
> ... We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.

*Id.* at 153–54, 111 S.Ct. at 491, 112 L.Ed.2d at 498. Since *Minnick*, it has been clear that the Fifth Amendment right to counsel encompasses a right to have counsel present during questioning, not just a right to terminate questioning in order to consult with counsel before interrogation begins anew.

There is an obvious distinction between Tapp's circumstance and the facts of *Minnick*, for Minnick's attorney was not involved at all when interrogation resumed, whereas Tapp's attorneys were allowed to monitor the interrogation and, presumably, could have interrupted or terminated it if they wished to do so by walking into the interrogation room. The question presented is thus whether this close proximity and opportunity for the attorneys to observe the interrogation, albeit on a television monitor in another room, satisfies the requirement that counsel be "present" during interrogation.

■ We have been referred to no decisional authority applying a constitutional right to counsel in circumstances like this, where counsel was allowed to observe an interrogation from a distance but was not in the same room. It is our judgment, however, based upon the rationale for the right to counsel during custodial interrogation expressed in *Miranda* and its progeny, that the police practice utilized here violated *Miranda* standards. The purpose expressed in *Miranda* for affording a right to counsel was to provide a counterbalance for the coercive atmosphere of custodial interrogation and thereby prevent violation of the right to be free from compelled self-incrimination. The *Miranda* decision explained:

We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so as freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

. . . .

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to

the protection of the Fifth Amendment privilege under the system we delineate today.

*Miranda*, 384 U.S. at 467, 469, 86 S.Ct. at 1624, 1625, 16 L.Ed.2d at 719, 721.

We doubt that the system under which Tapp was interviewed afforded the cushion from "inherently compelling pressures" that *Miranda* and its progeny require. Although Tapp's attorneys could see him and hear his words, he could not see or hear them; he was as physically alone with the interrogating officers as he would have been if his attorneys were in their own offices. He did not have the psychological reassurance of their physical presence nor the ability to turn to them for an *immediate* consultation. We think it obvious that a suspect's knowledge that his attorney is monitoring the interrogation from some other point in the building cannot provide the same bulwark against the coercive pressures of in-custody interrogation that is afforded by the immediate availability and reassuring presence of an attorney in the same room. It is no answer to say that Tapp was free to terminate the interrogation and talk with his attorneys at any time, for the same could be said if his attorneys were available by telephone from their offices. The interrogation system employed here prevented Tapp from simply turning to his attorneys for advice; it required that he, in effect, reinvoke his right to counsel by terminating the interrogation any time he desired a consultation. It afforded Tapp the opportunity for a series of consultations with his counsel instead of the *presence* of his counsel throughout the police interrogation.

Further, the value of any service the attorneys could provide was diminished by the physical separation. Attorneys in such a situation cannot instantaneously stop questioning that they deem to be inappropriate or police conduct that they deem to be abusive or coercive. Regardless of how vigorously the attorneys might object to a question or wish to terminate an answer, they can do nothing to stop a client's response until they physically enter the interrogation room to interrupt. This lapse between an attorney's objection and the opportunity to communi-

cate it could have very inimical consequences for the accused.

Also contributing to our decision is the realization that a holding that the *Miranda* standards were satisfied in this circumstance would obscure the rule and lead to uncertainty. If the arrangement here is constitutionally acceptable, would the same be true if the attorneys were on another floor of the same building or in a nearby building? What if they were monitoring the interrogation room by closed circuit television from a point across town but could communicate with those in the interrogation room by telephone? It has often been noted that in the arena of constitutional rights, a bright line rule that can be readily understood and applied by officers in the field is preferable to obscure or flexible standards requiring case-by-case application in the courts. *See, e.g., Minnick,* 498 U.S. at 154–55, 111 S.Ct. at 491–92, 112 L.Ed.2d at 498–99; *Moran v. Burbine,* 475 U.S. 412, 425, 106 S.Ct. 1135, 1142–43, 89 L.Ed.2d 410, 423–24 (1986); *New York v. Belton,* 453 U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768, 773–74 (1981).

In its defense of the procedure used here, the State relies upon *State v. Rollins,* 245 Conn. 700, 714 A.2d 1217 (1998), where the suspect chose to make a statement after having discussed his case with an attorney, and *Riddle v. State,* 580 So.2d 1195 (Miss. 1991), where the suspect reinitiated the interrogation and confessed after speaking by telephone with an attorney who advised him to make a full statement. These cases do not stand for the proposition that an accused's right to counsel during custodial interrogation may be satisfied without counsel being physically present; they merely recognize that an accused may waive this right after consultation with counsel and without counsel being present at the time of waiver. Here, there is no contention that, at any time after Tapp invoked his right to counsel, he ever waived the right to have counsel present during questioning or personally initiated further discussions with police. Rather, Tapp (and apparently his attorneys) simply complied with police direction as to the man-

ner in which the interviews would be conducted.

■ Having concluded that the Fifth Amendment right to counsel was violated by police procedures in this case,[2] we must determine which of Tapp's interrogations should have been suppressed. The Fifth Amendment right to counsel applies whenever a suspect is subjected to "custodial interrogation." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706; *State v. Kuzmichev,* 132 Idaho 536, 543, 976 P.2d 462, 469 (1999); *State v. Silva,* 134 Idaho 848, 854, 11 P.3d 44, 50 (Ct.App.2000). The parties agree that Tapp was not in custody during the January 7, 10 and 18 interviews. Therefore, there was no *Miranda* violation as to those interrogations. As to the January 11 interview, the record shows that, except for the portion of the interview that was suppressed by the district court, Tapp's attorney was present with him in the same room during questioning. Therefore, Tapp has shown no violation of the right to counsel on January 11. The interviews of January 15, 17, 30, and 31 all occurred while Tapp was incarcerated and formally charged, and it is undisputed that these were custodial interrogations during which Tapp was separated from his counsel. Therefore, all statements Tapp made to police on these dates should have been suppressed.

■ The parties disagree as to whether Tapp was "in custody" during the January 29 questioning, which occurred at the LEB and at the crime scene. The district court made no express finding of fact on the issue, but Tapp asserts that the district court implicitly found that he was in custody on January 29. The failure to make explicit findings of fact "is not fatal to the determination of a suppression motion. Instead, we 'examine the record to determine the "implicit" findings which underlie the judge's order.'" *State v. Birkla,* 126 Idaho 498, 501, 887 P.2d 43, 46 (Ct.App.1994) (quoting *State v. Middleton,* 114 Idaho 377, 380, 757 P.2d 240, 243 (Ct. App.1988)).

**2.** Because of this holding, it is unnecessary for us to address the factual question of whether at least one of Tapp's attorneys was in the LEB during each interview.

It is clear that Tapp was not under formal arrest at the time of his January 29 interviews. However, formal arrest is not a factual prerequisite to a finding of custody. For *Miranda* purposes, "custody" occurs when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 335 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279–80 (1983)). This is an objective test that is based on the totality of the circumstances; the inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3141, 82 L.Ed.2d at 336. *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714, 719 (1977); *Birkla, supra*.

The surrounding circumstances establish that Tapp was not "in custody" when he was interrogated by police on January 29. Tapp initially appeared voluntarily at the LEB on that date with counsel and was told at the outset that the prosecutor considered the immunity agreements to be void. Despite this development, Tapp did not decline further interviews or invoke his privilege against self-incrimination. There is no evidence that the police ever told Tapp that he could not leave or that he had to undergo interrogation. At *no time* during questioning was he under arrest or led to believe that he was under arrest. In fact, an officer at one point told Tapp that although it was likely he would eventually be going to prison, he wasn't going to be put in jail *that day*. Tapp himself asked to be taken to the crime scene, where the interview continued and where he ultimately made some of his most self-incriminating statements. His attorney was invited, but declined, to accompany him. Having reviewed the record, we conclude that the district court did not implicitly find that Tapp was in custody during the January 29 interviews, and if such a finding had been made, it would not be supported by the record. We hold that Tapp was not in custody on January 29, and therefore his Fifth Amendment right to counsel did not attach and was not violated. Only Tapp's statements made on January 15, 17, 30, and 31 are suppressible for Fifth Amendment violations.

### 3. Sixth Amendment right to counsel

Because we have concluded that some of Tapp's statements to police were not subject to suppression under *Miranda* for a Fifth Amendment violation, we must consider Tapp's alternative argument that his Sixth Amendment right to counsel was violated as to the remaining interviews. The Sixth Amendment to the United States Constitution assures that in all criminal prosecutions, the accused enjoys the right "to have the assistance of counsel for his defense." Unlike the Fifth Amendment right to counsel, which applies whenever a suspect is in custody, the Sixth Amendment right does not arise until the suspect has become a defendant in a criminal proceeding. *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411, 416–17 (1972). "The commencement of the criminal prosecution, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment, marks the 'critical stage of the prosecution' to which the guarantees of the Sixth Amendment are applicable." *State v. Waggoner*, 124 Idaho 716, 719, 864 P.2d 162, 165 (Ct.App.1993). *See also State v. Harmon*, 131 Idaho 80, 86, 952 P.2d 402, 408 (Ct.App.1998); *State v. Shelton*, 129 Idaho 877, 880–81, 934 P.2d 943, 946–47 (Ct.App. 1997). Thus, under criminal procedures followed in Idaho, a defendant's Sixth Amendment right to counsel is triggered by the filing of a criminal complaint or an indictment. *See* Idaho Criminal Rule 3; *In re McNeely*, 119 Idaho 182, 187, 804 P.2d 911, 916 (Ct.App.1990).

Tapp was charged as an accessory to a felony on January 11. Before that charge was dismissed on January 17, he was interviewed three times, on January 11, 15, and 17. On January 30, Tapp was again charged by complaint with being an accessory to a felony. No charges were pending in the interim.[3] Therefore, he had a Sixth Amend-

---

3. So far as we can discern from the record, Tapp was never charged with aiding and abetting an

aggravated battery, the offense to which he

ment right only during the interviews of January 11, 15, 17, 30 and 31. Tapp had no Sixth Amendment right to counsel on January 7, 10, 18, and 29, when no charges were pending, despite the fact that he was represented by privately retained counsel. *See Moran*, 475 U.S. at 430, 106 S.Ct. at 1145, 89 L.Ed.2d at 427 ("[I]t makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation."). As noted above, Tapp's attorney was at his side during the January 11 interview, except for the portion that was suppressed by the district court. Therefore, he has not shown any deprivation of the Sixth Amendment right to counsel regarding the unsuppressed portion of the January 11 interview. We consequently conclude that any potential violation of the Sixth Amendment right to counsel occurred only in the same interviews that we have already deemed suppressible for infringement of the Fifth Amendment right.

### 4. Due Process

 Tapp's final challenge to the use of his statements is a claim that some or all of the statements were coerced and involuntary. The use of an involuntary statement against a defendant is a violation of the Fourteenth Amendment's guarantee of due process of law. *Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 448–50, 88 L.Ed.2d 405, 410–11 (1985); *Haynes v. Washington*, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343–44, 10 L.Ed.2d 513, 521 (1963); *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct.App.1998). Therefore, we must examine the circumstances surrounding the interviews of January 7, 10, 18 and 29, which we have held not to be suppressible for Fifth or Sixth Amendment violations, to determine whether some or all of them should have been suppressed as involuntary. *See Miller, supra.* ("[E]ven after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations, ... and is binding on the States, ... the Court

agreed to plead guilty in the immunity agree-

has continued to measure confessions against the requirements of due process.")

 To determine the voluntariness of a confession, the court examines the totality of the circumstances to ascertain whether the defendant's will was overborne by police coercion when the confession was made. *Arizona v. Fulminante*, 499 U.S. 279, 285–86, 111 S.Ct. 1246, 1251–52, 113 L.Ed.2d 302, 314–15 (1991); *Colorado v. Connelly*, 479 U.S. 157, 167–68, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473, 484–85 (1986); *Doe*, 131 Idaho at 713, 963 P.2d at 396; *State v. Davila*, 127 Idaho 888, 892, 908 P.2d 581, 585 (Ct.App. 1995). Coercive police conduct is a necessary predicate to finding that a confession was involuntary within the meaning of the Due Process Clause. *Connelly*, 479 U.S. at 167, 107 S.Ct. at 521–22, 93 L.Ed.2d at 484–85. The State need prove the voluntariness of a confession only by a preponderance of the evidence. *Id.* at 169, 107 S.Ct. at 522–23, 93 L.Ed.2d at 485–86; *Davila, supra.*

 When Tapp was interviewed, he was twenty years old and had a high school education. There is no indication that he has an unusually low IQ or suffers from any cognitive defects. The interviews occurred on several days over the course of a month's time. They varied in length, but, with the exception of the January 11 interview, they took place during daylight hours. Tapp does not argue that he was subjected to interrogations of excessive length or that he was deprived of food or sleep. *Miranda* warnings were given to Tapp before each interview. All of these factors weigh against a finding of involuntariness. *See State v. Fabeny*, 132 Idaho 917, 920, 980 P.2d 581, 584 (Ct.App. 1999).

Nevertheless, Tapp argues that the State used various interrogation techniques to confuse him and coerce him into saying whatever the police wanted to hear. First, Tapp claims that he was induced to confess by unkept promises of leniency. On January 29, an investigating officer told Tapp that another immunity agreement could be worked out if Tapp gave the name of the unidentified participant in the crime. However, Tapp

ments.

never gave the information—the name of the unidentified party—on which the offer of leniency was predicated. Further, this promise was not conditioned on Tapp admitting to having taken an active part in the crimes; rather, it was offered despite Tapp's having already admitted to actively assisting the principal perpetrators. Therefore, this promise could not have induced Tapp's confession.

■ Tapp also claims that the police improperly used his religious beliefs to induce a confession. In particular, he claims that an officer offered him divine forgiveness through confession. Tapp's characterization of the conversation is not supported by the record. Here, although the officer discussed his own ecclesiastical beliefs and offered to take the confession Tapp had expressed a desire to make, he prefaced that offer by specifically disclaiming any power to grant divine absolution. References to religious sentiments are not coercive *per se*. *United States v. Miller*, 984 F.2d 1028 (9th Cir.1993); *Welch v. Butler*, 835 F.2d 92 (5th Cir.1988); *State v. Cheatham*, 134 Idaho 565, 575, 6 P.3d 815, 825 (2000). Moreover, even if the officer's comments were deemed an impermissible appeal to religious sentiment, it would not lead to suppression of any statements because Tapp made no *new* admissions after this discussion took place.

■ Finally, Tapp alleges that the police used provocative questions to heighten his anxiety and stress and employed hypothetical questions to encourage speculative responses. Tapp has not, however, referred us to any authority suggesting that such interrogation techniques are impermissible. The use of hypothetical questions is not inherently coercive. "[T]he police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir.1994).

Having examined the totality of the circumstances, we conclude that the district court properly concluded that Tapp's disclosures to police were not the product of police coercion. Tapp has shown no error in the district court's refusal to suppress statements he gave to police on January 7, 10, 18 and 29.

**5. Harmless error analysis**

■ Having concluded that Tapp's statements to police given on January 15, 17, 30 and 31 were taken in violation of his Fifth Amendment right to counsel, we must determine whether the erroneous admission of these statements necessitates a new trial or constitutes harmless error in view of other confessions that were properly admitted into evidence. Even errors of constitutional dimension may be harmless in the context of the entire trial. *See Fulminante*, 499 U.S. at 306–12, 111 S.Ct. at 1262–66, 113 L.Ed.2d at 328–33 (stating that admission of a coerced confession may be harmless and enumerating other United States Supreme Court decisions in which constitutional errors in the conduct of a trial have been held harmless); *Milton v. Wainwright*, 407 U.S. 371, 372, 92 S.Ct. 2174, 2175, 33 L.Ed.2d 1, 3–4 (1972) (holding the admission of a confession obtained in violation of constitutional right to counsel was harmless); *Chambers v. Maroney*, 399 U.S. 42, 52–53, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419, 428–30 (1970) (holding that admission of evidence obtained in violation of the Fourth Amendment was harmless). The erroneous admission of a confession will not require a new trial if the error was harmless beyond a reasonable doubt. *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331–32. *See also Milton, supra*. This requires a determination "whether a reviewing court can find beyond a reasonable doubt that the jury would have reached the same result without the admission of the challenged evidence." *State v. Moore*, 131 Idaho 814, 821, 965 P.2d 174, 181 (1998) (quoting *Giles v. State*, 125 Idaho 921, 925, 877 P.2d 365, 369 (1994)).

■ In the present case, we have held that Tapp's statements made on January 29 in response to police questioning were properly admitted. Because these statements included explicit and highly incriminating confessions, we conclude that the erroneous admission of other confessions made on oth-

er dates was harmless. On January 29, while in Dodge's apartment, Tapp admitted that he helped restrain Dodge when she was being raped and when Hobbs cut her throat. After Tapp and the officers returned to the LEB on the same day, Tapp admitted that he held Dodge's arms down while she was being raped and forced to engage in fellatio. He also confessed that he was holding Dodge's arms when Hobbs stabbed her in the chest which, according to Tapp, was the first time she was stabbed. He claimed to have released her arms and stood up immediately when that happened, implying no further participation. However, later in the same interview he admitted that he was also holding Dodge's arms when the unidentified participant stabbed her. Thus, in his conversations with police on January 29, Tapp admitted to having helped restrain Dodge while she was sexually attacked, while Hobbs inflicted the initial stab wound to the chest, while the unidentified participant again stabbed her in the chest, and while Hobbs cut her throat. We are confident beyond a reasonable doubt that if these detailed confessions made on January 29 had been the only statements from Tapp heard by the jury, the verdict would have been the same. Therefore, the judgment of conviction will not be disturbed.

## B. Sentence

██ Tapp also challenges his sentences, contending that they represent an abuse .of the district court's sentencing discretion. For the first degree murder conviction, the district court imposed a minimum term of thirty years imprisonment followed by an indeterminate term of life, plus a fifteen-year indeterminate enhancement for use of a deadly weapon pursuant to I.C. § 19–2520. For rape, the court imposed a ten-year minimum term followed by a fifteen-year determinate term with the rape sentence to run concurrent with the murder sentence.

██ Our standards for appellate review of a sentence are well settled. *State v. Wolfe*, 99 Idaho 382, 384, 582 P.2d 728, 730 (1978). If a sentence is legal, the appellant bears the burden to show that it is "excessive under any reasonable view of the facts," and

thus a clear abuse of discretion. *State v. Gomez*, 127 Idaho 327, 330, 900 P.2d 803, 806 (Ct.App.1995) (quoting *State v. Charboneau*, 124 Idaho 497, 500, 861 P.2d 67, 70 (1993)). *See also State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence is reasonable if confinement appears necessary "to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case." *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). On review of a sentence, we conduct an independent examination of the record, focusing upon the nature of the offense and the character of the offender. *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). This Court will not substitute its own view for that of the sentencing judge where reasonable minds might differ. *Toohill, supra.*

The maximum punishment for first degree murder is the death penalty, which the State sought in this case. The district court found, however, that there were mitigating factors that made imposition of the death penalty inappropriate including, among other things, Tapp's youth, the fact he had mental health problems and no prior documented history of violence, that he did not personally rape or inflict fatal wounds on the victim, and that he ultimately cooperated with police and confessed his involvement. The court concluded, however, that the need to protect society, deter violent crime, and punish Tapp required the lengthy prison sentence that was imposed.

Tapp argues that his sentences are unduly harsh on any reasonable view of the facts. He relies on the facts that he was convicted solely on his own confession, that he did not personally commit a rape or personally inflict any life-threatening wounds, and that his participation in this crime was a result of his substance abuse and other emotional and psychological problems. Finally, Tapp argues that his young age should have been given greater consideration.

The factors that Tapp identifies as calling for reduction of his sentence were known to the district court and served as part of the basis for the district court's decision not to

impose the death penalty or a fixed life sentence but, rather, to leave open the possibility of parole after Tapp has served the minimum thirty-year term. Tapp does not contend that the district court failed to consider all these factors; he merely asks this Court to reweigh the same factors and come to a more lenient result. Tapp assisted others to commit a senseless and brutal rape and murder. That he could be so easily led to participate in such heinous crimes indicates that he presents a serious danger and that a lengthy prison term is necessary for the protection of society. Further, the sentence of imprisonment imposed on Tapp serves to provide suitable retribution and may also serve to deter others. In view of the nature of his offenses and the goals of sentencing, we conclude that the district court did not abuse its discretion in crafting Tapp's sentences.

## III.

## CONCLUSION

The State violated Tapp's Fifth Amendment right to counsel by interrogating him while his attorneys were in a separate room, and the district court therefore erred in denying Tapp's suppression motion as to some of the interrogations. However, some of the interviews, conducted while no constitutional right to counsel was operative, were correctly admitted into evidence. When the evidence that was properly admitted is taken into account, we find beyond a reasonable doubt that the error was harmless. We also conclude that Tapp's sentences are not excessive. Therefore, the judgment of conviction and sentences are affirmed.

Judge PERRY and Judge Pro Tem HART CONCUR.