**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39299**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2013 Opinion No. 27 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: May 14, 2013 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| CHRIS ALLEN STONE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Renae J. Hoff, District Judge.

Order denying motion to suppress, <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett, LLP for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

SCHWARTZMAN, Judge Pro Tem

Chris Allen Stone appeals from his judgment of conviction entered following his conditional plea of guilty to second degree murder, Idaho Code §§ 18-4001, 18-4002, 18-4003(g). Specifically, Stone challenges the district court's order denying his motion to suppress statements he made to police officers. We affirm.

## I.

## FACTS AND PROCEDURE

Police officers were dispatched to a residence to investigate a shooting. Upon arrival, officers made contact with Stone who told the officers that "it was self-defense, she had stabbed him and that he had to do it." Officers then discovered Stone's estranged wife slumped in the back of a van in the driveway with two gunshot wounds in the back of her head. The officers

1

read Stone his *Miranda*[1] warnings and Stone responded that he understood his rights. Stone then volunteered information about himself, including that he was forty-nine years old, he was a speech pathologist, he had a concealed weapon permit, he had never been arrested, and he had never previously shot anyone or been stabbed.

An ambulance arrived and transported Stone to a hospital for treatment of a stab wound. An officer accompanied Stone in the ambulance and stayed with him at the hospital. During the ambulance ride, and while at the hospital, Stone continued to volunteer information to the officer and medical staff. He told the officer that his wife went to his house to pick up some belongings, stabbed him with a knife, and then he pulled a gun out of his pocket and shot her twice. Stone also said his wife only married him "for a green card."

While at the hospital, a detective arrived and, again, read Stone his *Miranda* warnings. Stone reiterated that he understood his rights. The detective also informed Stone that he was not under arrest or in custody. Stone then proceeded to tell the detective the same story he told the officer. Eventually, Stone received a CT scan, the results of which indicated to the detective that Stone was not stabbed by his wife, but instead the stab wound was likely self-inflicted. After being confronted with this information, Stone altered his story slightly. He told the detective that he and his wife engaged in a verbal altercation and his wife told him that she only married him for a green card. Stone told the detective that after hearing those words, he pulled out his gun and threatened her. She then allegedly stabbed him and he then shot her twice. Stone was placed in custody following his medical treatment. While in jail, Stone called his mother and told her the same story he told the detective.

Stone was charged with second degree murder. He filed a motion to suppress all evidence obtained: (1) during the interrogation at his residence; (2) during the interrogation in the ambulance; (3) during the interrogation at the hospital; and (4) during his telephone conversation with his mother while he was in jail. At the suppression hearing, defense counsel called two expert witnesses to testify. The first expert, a sociology professor, testified about police interrogation techniques and how those techniques were applied during Stone's interrogation. The second expert, Dr. Beaver, a neuropsychologist, testified regarding Stone's psychological makeup and Stone's medical status during the interrogation. The State objected to

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

this testimony in its entirety on the grounds of relevance. The district court deferred its ruling on the objection until after hearing the testimony. Following testimony, the district court ruled that it would consider Dr. Beaver's testimony regarding Stone's medical status, but it would not consider his testimony regarding Stone's psychological makeup.

Following the hearing, the district court denied Stone's motion to suppress. Stone entered a conditional guilty plea to second degree murder, reserving his right to appeal the district court's denial of his motion to suppress. The district court imposed a unified term of twenty years, with nine years determinate. Stone appeals.

## II.

## ANALYSIS

Stone claims that the district court erred when it denied his motion to suppress. Specifically, Stone argues that: (1) the district court erred in concluding that Stone's statements were voluntary; and (2) the district court erred by declining to consider the entire testimony of Dr. Beaver. The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## A.      Voluntariness of Statements

Stone claims that police conduct during interrogation became coercive and undermined his free will when officers: (1) made implied promises of leniency; (2) used the "false friend" interrogation technique; and (3) employed minimization techniques. Stone claims that such tactics constitute police coercion and require suppression. Stone also contends that even if this conduct is not sufficient on its own to merit suppression, the totality of the circumstances demonstrate that the officers' interrogation caused his will to be overborne, resulting in an involuntary confession. To support this contention, Stone maintains that: (1) his *Miranda* warnings were downplayed; (2) he had no prior experience with law enforcement; (3) he was questioned over an eight-hour period; (4) he was in a highly stressful environment; (5) he was in

3

pain resulting from his stab wound; (6) he had a high blood glucose level; (7) he had been administered Dilaudid; (8) he was unable to meet with his parents; and (9) he was highly suggestible. Based on these factors, Stone contends that the totality of the circumstances show that his statements were involuntary and should be suppressed.

### 1. Police coercion

In *State v. Valero*, 153 Idaho 910, 285 P.3d 1014 (Ct. App. 2012), we stated:

> The United States Supreme Court has recognized that a noncustodial interrogation might in some situations, by virtue of some special circumstance, be characterized as one where a defendant's confession was not given voluntarily. *See Beckwith v. United States*, 425 U.S. 341, 347-48 (1976); *see also State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 [(1993)]. In order to find a violation of a defendant's due process rights by virtue of an involuntary confession, coercive police conduct is necessary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *State v. Whiteley*, 124 Idaho 261, 268, 858 P.2d 800, 807 (Ct. App. 1993). The state must show by a preponderance of the evidence that the defendant's statements were voluntary. *Whiteley*, 124 Idaho at 268, 858 P.2d at 807.
>
> The proper inquiry is to look to the totality of the circumstances and then ask whether the defendant's will was overborne by the police conduct. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *Troy*, 124 Idaho at 214, 858 P.2d at 753. In determining the voluntariness of a confession, a court must look to the characteristics of the accused and the details of the interrogation, including: (1) whether Miranda warnings were given; (2) the youth of the accused; (3) the accused's level of education or low intelligence; (4) the length of the detention; (5) the repeated and prolonged nature of the questioning; and (6) deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Troy*, 124 Idaho at 214, 858 P.2d at 753.

*Id.* at 911-12, 285 P.3d at 1015-16 (quoting *State v. Cordova*, 137 Idaho 635, 638, 51 P.3d 449, 452 (Ct. App. 2002)). If the defendant's free will is undermined by threats or through direct or implied promises, then the statement is not voluntary and is inadmissible. *Valero*, 153 Idaho at 912, 285 P.3d at 1016; *State v. Wilson*, 126 Idaho 926, 929, 894 P.2d 159, 162 (Ct. App. 1995).

We start by addressing Stone's contention that police coercion--using implied promises of leniency, the "false friend" interrogation tactic, and minimization techniques--requires suppression by itself. First, Stone argues that the detective made implied promises of leniency, as demonstrated by the following statements by law enforcement officers:

> The difference between me and a judge, you know, I've got the powers to investigate. I've got the powers to make recommendations and I've got the powers to keep people safe but, ultimately, he's the decision maker.
> . . . .

4

Who do you think the judge is going to be more lenient, going to be more--going to want to work with more, okay?

. . . .

I had every intention of doing--honoring exactly what I told you but once you started lying to me about this stuff, you know, all bets are off. I can't.

. . . .

From my experience, somebody who wants to bullshit the system versus somebody who takes accountability, there seems to be some disparity between the sentence, okay?

Stone claims that these statements were designed to implicate that confession would lead to leniency, and denying guilt would lead to severe punishment. Promises of leniency, especially vague assurances of leniency, do not necessarily render a confession involuntary. *State v. Radford*, 134 Idaho 187, 192, 998 P.2d 80, 85 (2000); *Wilson*, 126 Idaho at 929, 894 P.2d at 162. "Rather, they are only a factor to be considered under the totality of the circumstances." *Radford*, 134 Idaho at 192, 998 P.2d at 85. "The reviewing court must determine whether the statements made to the defendant were sufficient to undermine the defendant's free will." *Wilson*, 126 Idaho at 929, 894 P.2d at 162. "Promises made by law enforcement officers without the authority to fulfill such promises may render a confession involuntary." *Valero*, 153 Idaho at 915, 285 P.3d at 1019.

The district court found that any promise of leniency was not sufficiently compelling to undermine Stone's will. We agree. The detective's statements were vague assurances of leniency, if anything. His statements were not connected to a promise of a specific benefit. Thus, unlike *State v. Kysar*, 114 Idaho 457, 459, 757 P.2d 720, 722 (Ct. App. 1988), where the officer told the defendant he would be out of jail before his baby was born, the detective never promised Stone a specific sentence. The only representation the detective made was that the judge could provide a shorter sentence if he cooperated. Further, the detective informed Stone that the judge was the ultimate decision maker. *See Whiteley*, 124 Idaho at 269, 858 P.2d at 808 (holding that one reason the district court did not err in denying Whiteley's motion to suppress was because the officer informed him that he did not have the authority to fulfill any promise as to sentencing).

Next, Stone contends that the detective and officer used an improper "false friend" interrogation tactic that "deprived him of critical information necessary to fairly understand the situation and to exercise his free will." Stone points this Court to *State v. Rettenberger*, 984 P.2d

5

1009, 1016-17 (Utah 1999), to explain the "false friend" technique. Using this technique, police officers represent to the defendant that they are his friends and that they are acting in his best interest. The Utah Supreme Court determined that the false friend technique *could* become coercive if other tactics and factors are present. *Id.* That Court held that the defendant's mental disabilities and deficiencies, along with the "false friend" interrogation tactic, rendered the defendant's confession involuntary. *Id.* The eighteen-year-old defendant was found to have mental deficiencies because he suffered from A.D.D., had the maturity level of a fifteen-year-old, had a below average I.Q., and was more susceptible to stress and coercion than the average person. *Id.* at 1014.

In the instant case, Stone maintains that the "false friend" technique combined with his mental deficiencies render his statements involuntary. In order to demonstrate that the "false friend" tactic was employed, Stone asserts that the detective and officer cast themselves as friends and protectors rather than accusers, as demonstrated by the following statements:

| | |
|---|---|
| STONE: | I hope I don't get in trouble over this. I know I killed someone. I hope I don't get in trouble over this. |
| UNIDENTIFIED: | I'm not a police officer. |
| [OFFICER]: | Again, like he mentioned earlier, our main concern now is your well-being internally, you know? |
| . . . . | |
| STONE: | Will you guys be contacting me? |
| [DETECTIVE]: | We're going to cover all this. This is--we're still--understand this is--we do--we have to do a very thorough investigation just to protect you as much as to protect her, right? There's nobody-- |
| STONE: | When you say "her," do you mean-- |
| [DETECTIVE]: | Well, there's nobody to speak for her so we have to look into that, but [by] the same token, we have to protect you just as much. Does that make sense in a way? |
| STONE: | I hope so because right now, I feel like I'm all on my own and-- |
| [DETECTIVE]: | We weren't there so we have to gather all the facts together. [Alright]? And go from there. So that's what we're trying to do right now. |

Stone asserts that this tactic was overbearing because he, like the defendant in *Rettenberger*, suffered from a mental deficiency; namely, that he was highly suggestive, as described by Dr. Beaver in the portion of his testimony that was not considered by the district court. Stone contends that the "false friend" tactic, combined with his suggestibility, contributed

6

to a coercive environment that overcame his free will. The district court found that tactics used by the police during interrogations did not go "beyond what's considered appropriate."

Additionally, Stone contends that the detective used minimization techniques during the interrogation, citing to the following statements:

STONE:          I'm going to be a great dad in prison.

[DETECTIVE]:    No. This is not the crime of the century. There's going to be consequences but I'll tell you what, they're going to be a whole hell of a lot more severe if you keep on playing the lie and deceit game, okay?

. . . .

[DETECTIVE]:    I'm not saying this is a good thing but it's not the end of the world regardless of what you think in the back of your head. But I'll tell you what, you're digging yourself in deeper by not (inaudible).

. . . .

[DETECTIVE]:    You know, what separates a man from a boy isn't the mistakes they make. It's the ability to man up and not make excuses, make lies, blame everybody else on what happened. A bad thing happened, yes. It's terrible but it's not the end of the world. But you make it and you lie about it and you fabricate stuff, yes, you're going to dig yourself in deep. You're taking a bad situation. You're making it worse.

STONE:          What's worse than murder?

[DETECTIVE]:    A liar by far.

Stone argues that these statements demonstrate a minimization technique that contributed to the coercive environment. Downplaying the seriousness of the accusation is a factor to consider in the totality of the circumstances. *Valero*, 153 Idaho at 915, 285 P.3d at 1019. A finding that the defendant understood the nature of his rights and realized the seriousness of the events weighs against a finding of involuntariness. *See Wilson*, 126 Idaho at 929, 894 P.2d at 162. The district court found "no evidence that Stone did not understand his rights," and that he understood the seriousness of the events. Stone made several comments throughout the interrogation indicating that he was aware he could "go to jail for the rest of [his] life."

We conclude that the foregoing scenario does not support a finding that Stone's statements were involuntary or that coercive police interrogation techniques were used to undermine Stone's free will. Indeed, the record reflects that Stone's prior statements were *substantially the same* as his statements following the alleged police coercion. Earlier, Stone

7

repeatedly stated that he shot his wife after she stabbed him with a knife. When police officers first arrived at Stone's residence, Stone maintained:

> And if I hadn't have had my gun, she'd be calling you right now telling you I'm dead.
> . . . .
> She stuck that fucking knife deep inside me.
> . . . .
> I tell you one thing, if I wouldn't have had my gun with me, she'd be calling you right now telling you I'm dead and she's alive.
> . . . .
> The next thing I know, she's got her head turned and I got a knife in me and a fight (inaudible).
> . . . .
> I told you two or three times. I'll say it again. Right now. If I hadn't -- I have a concealed weapons permit and if I hadn't have had that fricking concealed weapons permit and a gun on me, my wife would be standing here right now telling you why I'm dead.

Thereafter, Stone was taken to a hospital where he was treated for his stab wound. While receiving medical treatment, Stone was questioned by a detective. Throughout the questioning, Stone continued to assert that he shot his wife after she stabbed him:

> She turned her head kind of like this and that's when I saw the knife coming and the knife went in me and I immediately grabbed her hand--her hand was on the knife and my hand was on her hand and she was trying to push it in me and I was trying to take it out. In the meantime, the knife was getting twisted around pretty good and it felt like forever and I have a concealed weapons permit.
> . . . .
> And I thought of my gun, I took my gun out and I shot her twice.

Again, Stone made these statements prior to any alleged police coercion. Following the results of the CT scan, the detective confronted Stone with the theory that Stone shot his wife first and then stabbed himself afterwards. However, Stone continued to maintain his original story, stating: "She stabbed me and I shot her. That's the bottom line," and "All I'm telling you is she stabbed me and we played with the knife and I shot her." Nonetheless, the detective continued to question Stone. Eventually, Stone admitted the following:

> She said--we said some nasty words while we were walking out but the real ones were the (inaudible) "I just married you for a green card," and she said that with her back to me. And I pulled out my gun and I said, "I should just fucking kill you you lousy whore." I remember I said whore or bitch. I think I said whore.

8

And she turned around and she had her little knife with her and we got into each other's face and we started saying shit to each other and she poked me with the knife and she started--and I lifted my gun up and that's when I was going to shoot her and she turned her back to me and I killed her and that is the end of that.

Though Stone added additional facts, such as the specific verbal altercation and the fact that he took out his gun before being stabbed, he continued to assert that his wife stabbed him *before* he shot her. Nevertheless, the detective continued to ask if Stone's wife really stabbed him:

| | |
|---|---|
| [DETECTIVE]: | Did she really stick you? |
| STONE: | Yeah, she really stuck me. She really did and I'm not going to bullshit you. |
| . . . . | |
| [DETECTIVE]: | Straight up, Chris, did she stick you? |
| STONE: | Yes, she did stick me. |
| [DETECTIVE]: | I just want to make sure that we're being completely honest. |
| STONE: | Yes, she did stick me. Yes, she did stick me. |

Throughout the course of the interrogation, Stone continually maintained that his wife stabbed him and never adopted the detective's version of events that he stabbed himself. Thus, the statements made after the alleged police coercion were substantially the same as those made prior to the alleged coercion. In both instances, Stone asserted that he shot his wife after she stabbed him. Based on the foregoing, we conclude that the conduct of law enforcement officers, including their alleged statements of implied promises, their alleged minimization of the crime, and their alleged "false friend" interrogation tactic, were not sufficiently coercive to overcome the will of Stone and render his statements involuntary. Accordingly, we uphold the district court's conclusion that Stone's statements were not the product of police coercion elicited through the use of improper interrogation techniques.

2.      **Totality of the circumstances**

We next address Stone's contention that the *Bustamonte* factors weigh in favor of a finding that Stone's statements were involuntary. As to the first factor discussed in *Bustamonte*, Stone contends that his *Miranda* warnings were downplayed as mere formalities, and therefore he never understood the adversarial nature of the police officers' interrogations. A police officer

provided Stone his *Miranda* warnings upon arrival at Stone's residence. Immediately after providing Stone with those rights, the following conversation occurred:

[OFFICER]:   . . . Do you understand those?
STONE:        Yeah.
[OFFICER]:   Okay.
STONE:        Is it in my best interests to just be quiet?
[OFFICER]:   Completely up to you.
STONE:        (Inaudible) what happened.
[OFFICER]:   And obviously we like to get two sides of the story, you know what I mean? I want you to go ahead and stand up for me real quick, okay?
STONE:        Okay. I'll do whatever you want. I'm a professional.

Stone then proceeded to volunteer information about the incident. Stone received *Miranda* warnings a second time at the hospital. He again stated that he understood his rights. The district court found "there is no question that the rights were given." Further, the district court found that Stone "understood his rights and chose not to rely on those rights when he spoke." Accordingly, the court found that Stone "waived his rights." The district court's findings are supported by substantial and competent evidence. A district court's conclusion that a defendant made a knowing and voluntary waiver of his or her *Miranda* warnings will not be disturbed on appeal where it is supported by substantial and competent evidence. *State v. Custodio*, 136 Idaho 197, 201, 30 P.3d 975, 979 (Ct. App. 2001).

As to the youth of the accused and his level of education, the record demonstrates that Stone was forty-nine years old at the time of the interrogation. He was well-educated and had a master's degree in speech pathology. "Such a person is more resistant to interrogation than a person who is very young, uneducated, or weak-minded." *Valero*, 153 Idaho at 912, 285 P.3d at 1016 (determining that the characteristics of a thirty-eight-year-old defendant with a high school education weighed against finding that the confession was involuntary).

As to the deprivation of food or sleep, the district court found that Stone was not "deprived of his basic needs during the time that he was hospitalized." However, while at the hospital, Stone was administered Dilaudid, which is an opiate-type medication that relaxes the patient. Additionally, Stone's blood was tested and his blood glucose level was over four times the normal level. Stone asserts that this impaired his ability to think clearly. The district court did not find "any evidence to substantiate claims that the medication or the high blood sugar was affecting [Stone's] mental acuity." We agree. Our review of the record indicates that Stone

understood the questions posed to him and delivered clear and articulate responses. Further, Stone admitted that he was "cognitive, coherent" even though he was in pain. Additionally, Stone was described by the detective as "pleasant, lucid, joking, alert, and outgoing."

As to the length of the detention, the record demonstrates that officers asked Stone questions during a span of six to eight hours. However, during that time span Stone was at a hospital receiving medical treatment for a stab wound and undergoing medical examinations, such as a CT scan. Therefore, Stone was not consistently or continually questioned during the six to eight-hour time span. Further, the district court found that the questioning would not have lasted as long as it did if Stone "hadn't volunteered so much information."

We conclude that the factors discussed in *Bustamonte* weigh against a finding that Stone's statements were involuntary. Stone was provided his *Miranda* warnings on two occasions and stated that he understood his rights. He was forty-nine years old at the time and well-educated. There is no evidence to support the assertion that the medication he was given, his blood glucose level, or the pain resulting from his wound diminished his ability to understand his situation. On the contrary, the record demonstrates that Stone clearly understood the events as they transpired and continually volunteered information to law enforcement officers at his residence, during transportation to the hospital, and while at the hospital.

Finally, this case is distinguishable from our recent decision in *Valero*, where we affirmed the district court's decision to suppress statements on the basis that they were involuntary. In that case, Valero initially denied all the allegations. Following a polygraph examination, the detective told Valero that polygraph examinations were one-hundred percent accurate and were admissible in court. *Valero*, 153 Idaho at 914, 285 P.3d at 1018. The detective further informed Valero that he could be charged with a more serious crime of lying to the police if he did not confess. *Id*. at 916, 285. P.3d at 1020. Thereafter, Valero changed his initial statements and confessed to the crimes charged. This Court held that under the totality of the circumstances, Valero's confession was involuntary because the detective threatened him with a greater crime of lying to the police and the detective made legal misrepresentations and assertions. *Id.* The instant case is distinguishable in several aspects. First, Stone never materially changed his initial account of the events and never admitted to the crime. Second, the detective never made any legal misrepresentations and never threatened Stone with a greater crime of lying to the police.

11

Based on the foregoing, we conclude that the district court's findings are supported by substantial evidence from the record. Accordingly, the district court did not err in denying the motion to suppress, under the totality of the circumstances, on the basis of the evidence it considered.

**B.      Testimony of Dr. Beaver**

Stone contends that Dr. Beaver's testimony regarding Stone's psychological makeup, including his suggestibility, was relevant to show that his statements were not made voluntarily. The State contends that police coercion must be established before determining whether Dr. Beaver's testimony regarding Stone's psychological makeup was relevant. The State argues that police coercion did not exist; therefore, Stone's inquiry regarding Dr. Beaver's testimony is not reached. We review questions of relevancy de novo. *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993). "[T]he Rules of Evidence generally govern the admission of *all evidence* in the courts of this State." *State v. Meister*, 148 Idaho 236, 240, 220 P.3d 1055, 1059 (2009) (emphasis in original). "All relevant evidence is admissible except as otherwise provided by these rules or by other rules applicable in the courts of this state." Idaho Rule of Evidence 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401.

In the instant case, the district court found that Dr. Beaver's testimony regarding Stone's psychological makeup, including his suggestibility, was not relevant to its determination of whether Stone's confession was voluntary. However, the district court did consider Dr. Beaver's testimony regarding the effects of pain medications administered to Stone and the effects of Stone's diabetes. During the suppression hearing, Dr. Beaver testified that Stone was "highly suggestible in comparison to the average person," and tested higher than the average person in respect to his suggestibility. As a result, the expert testified that Stone was "more prone to want to please people in authority or power." Additionally, Dr. Beaver testified that Stone was socially anxious with few close friends and was very attached to his parents. Stone argues that this evidence should be a factor in determining whether police coercion caused his will to be overborne and, thus, resulted in involuntary statements. We agree.

The United States Supreme Court has said, "coercion can be mental as well as physical." *Fulminante*, 499 U.S. at 287 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)). "[A]s

12

interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Idaho courts have also looked to the defendant's subjective characteristics in considering the voluntariness of a confession. *See Woodward v. State*, 142 Idaho 98, 108, 123 P.3d 1254, 1264 (Ct. App. 2005) (among other factors, court looks to facts that defendant was "of normal intelligence," and had "had prior experience with law enforcement officers."); *State v. Cordova*, 137 Idaho 635, 639, 51 P.3d 449, 453 (Ct. App. 2002) (court lists whether defendant had "a history of mental illness" as a consideration bearing on the voluntariness of his statements, but notes that only counsel's representation to this effect, as opposed to actual evidence, was presented at the suppression hearing); *State v. Tapp*, 136 Idaho 354, 364, 33 P.3d 828, 838 (Ct. App. 2001) (unusually low I.Q. or cognitive defects).

Here, Dr. Beaver testified that Stone was highly suggestible and socially anxious. While Stone's suggestibility and mental condition alone are not sufficient to justify suppression absent a showing of police coercion; nonetheless, it is a factor the court should have considered under the totality of circumstances. Therefore, we determine that the district court erred by failing to consider Dr. Beaver's testimony concerning the psychological makeup of Stone.

Next we must determine whether the district court's failure to consider Dr. Beaver's testimony regarding Stone's psychological makeup requires remand to the district court or whether this Court can address the merits of the issue. The district court made an evidentiary ruling when it found that Dr. Beaver's testimony regarding Stone's psychological makeup was irrelevant. The Idaho Rules of Evidence require that when appealing an exclusion of evidence, the "substance of the evidence was made known to the court by offer or was apparent from the context . . . ." I.R.E. 103(a)(2). The purpose of this rule is to preserve a record for appeal and to enable the court to rule on the evidence's admissibility. *Kuhn v. Coldwell Banker Landmark, Inc.*, 150 Idaho 240, 251, 245 P.3d 992, 1003 (2010). *See also State v. Joslin*, 145 Idaho 75, 82, 175 P.3d 764, 771 (2007). In the instant case, the district court elected to hear Dr. Beaver's entire testimony as an offer of proof, as well as received briefing and oral argument regarding the issue. Therefore, the record contains a sufficient offer of proof for this Court to determine whether the entirety of Dr. Beaver's testimony would alter the district court's finding that

13

Stone's statements were voluntary. We conclude that remand is unnecessary and elect to address the merits of the issue.[2]

We hold that the district court's error was harmless. "In Idaho, the harmless error test established in [*Chapman v. California*, 386 U.S. 18 (1967)] is now applied to all objected-to-error." *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010). *See State v. Pearce*, Docket No. 30502 (Ct. App. May 30, 2007) (unpublished) (holding that the district court's error of excluding an expert's testimony regarding suggestibility, where an extensive offer of proof had been made, was harmless error);[3] *cf. State v. Critchfield*, 153 Idaho 680, 685, 290 P.3d 1272, 1277 (Ct. App. 2012) (applying the harmless error analysis where the district court improperly excluded expert testimony and finding that the error was not harmless). Accordingly, the State has the burden of demonstrating that the error did not contribute to the district court's decision to deny Stone's motion to suppress. The State asserts that even if the district court were to consider Dr. Beaver's testimony, the totality of the circumstances support the finding that Stone's statements were voluntary. We agree.

The purpose of Dr. Beaver's testimony was to demonstrate that Stone's psychological makeup, particularly his high suggestibility, contributed to his will becoming overborne. Dr. Beaver testified that suggestibility measures how easily it is to change a person's opinion, recollection, or perception. Dr. Beaver further testified that Stone had a high level of suggestibility that caused Dr. Beaver to "have significant concern about how easily . . . his memory of events could be changed."

Even considering Dr. Beaver's entire testimony, the record reveals that Stone never submitted himself to the detective's version of events. The detective implied that he believed Stone shot his wife and then stabbed himself with a knife. Stone never admitted to this version

---

[2]    We note that the district judge handling this case has since retired from the bench.

[3]    *State v. Pearce*, Docket No. 30502 (Ct. App. May 30, 2007) (unpublished) is an opinion that was not published in the permanent law reports. In that opinion, this Court determined that the trial court erred by excluding expert testimony, but that the error was harmless. Following this Court's opinion, the Idaho Supreme Court took the case on review. The Idaho Supreme Court affirmed the ruling of the district court, but on different grounds. The Idaho Supreme Court determined that the trial court's exclusion of expert testimony was not error; therefore, it never discussed the harmless error test. *State v. Pearce*, 146 Idaho 241, 245-48, 192 P.3d 1065, 1069-72 (2008).

14

of events. Instead, Stone continued to assert that his wife stabbed him and then he shot her afterwards. As the night progressed, the only change that Stone made in his version of events was that he admitted to taking his gun out of his pocket and threatening his wife prior to being stabbed. Nonetheless, he still claimed that his wife stabbed him. Even after being presented with evidence indicating the stab wound was self-inflicted, Stone continued to maintain that the stab wound was created by his wife. As such, Stone's recollection of the events was never substantially altered to submit to the detective's "suggested" version.

Further, the totality of the circumstances, including considering Dr. Beaver's testimony in its entirety, show that Stone's statements were voluntary. As discussed above, Stone was aware of his *Miranda* rights, the seriousness of his accusations, and the questions posed to him. His responses to questions demonstrate that he was coherent, rational, and knowledgeable. He willingly volunteered information to law enforcement officers prior to being questioned and continued, unrestrained, to volunteer information throughout the night whether a question was posed to him or not.

On the whole, the district court had before it the audio recordings of Stone's interrogation, the transcript of the interrogation, expert testimony regarding police interrogation tactics, and expert testimony regarding Stone's mental acuity and physical condition at the time he made incriminating statements. Additionally, the district court acknowledged that Stone "never did truly adopt [the detective's] position that he had stabbed himself." Given the fact that we have the entire record before us, we conclude the district court's selective exclusion of Dr. Beaver's "suggestibility" testimony amounts to harmless error and that remand is unnecessary because the trial court's conclusions would have been the same.

### III.
### CONCLUSION

Stone's statements to law enforcement authorities were not the product of police coercion elicited through the use of overreaching interrogation techniques. In addition, under the totality of the circumstances, his statements were voluntary. Therefore, the district court's order denying Stone's motion to suppress is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**