**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 50816**

| | |
|---|---|
| STATE OF IDAHO,<br><br>　　　Plaintiff-Respondent,<br><br>v.<br><br>THOMAS B. ROWLEY,<br><br>　　　Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Filed: May 20, 2026

Melanie Gagnepain, Clerk

THIS IS AN UNPUBLISHED
OPINION AND SHALL NOT
BE CITED AS AUTHORITY

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. James S. Cawthon, District Judge.

Judgment of conviction for first degree murder, <u>affirmed</u>; denial of motion to suppress, <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender; Elizabeth A. Allred, Deputy Appellate Public Defender, and Jenny C. Swinford, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Raúl R. Labrador, Attorney General; Kale D. Gans, Deputy Attorney General, Boise, for respondent.

---

HUSKEY, Judge

Thomas B. Rowley appeals from his judgment of conviction for first degree murder. Rowley argues the district court erred in denying his motion to suppress his confession to killing his four-month-old child because Rowley's emotional state, combined with coercive police interview tactics, resulted in an involuntary confession. The State argues the district court did not err because Rowley's confession was voluntary, and nothing about the interview demonstrates any coercion. We hold the district court did not err in denying Rowley's motion to suppress his confession because the confession was not coerced and, therefore, was not involuntary. The district court's order denying Rowley's motion to suppress and Rowley's judgment of conviction are affirmed.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 3:30 p.m. on June 20, 2020, four-month-old M.R. was admitted to the neonatal intensive care unit (NICU) and placed on life support because he had no brain activity. According to the treating doctor, M.R. was suffering from multiple injuries including a "brain bleed, retinal bleeding, and fractured ribs." The rib fractures had begun to heal, indicating they were likely the result of prior injuries. M.R.'s injuries were "consistent with a persistent and aggressive shaking motion" so forceful that M.R.'s retinas had detached from his eyeballs.

Around 1:00 a.m. on June 21, 2020, two Boise Police Department officers, Detectives Ian Seavey and Jason Pietrzak, interviewed Rowley in a waiting room at the hospital. Rowley was given his *Miranda*[1] warnings. The interview lasted about one and one-half hours, with a break. During the interview, Rowley confessed that throughout the morning of June 20, M.R. was fussy. At one point, M.R. was sitting in an infant seat but would not stop "leaning over" so Rowley tipped the infant seat over and left M.R. like that for a minute or two, thinking, "if you want to be sideways, you can be sideways." M.R. continued to fuss and because M.R. had not stopped crying, Rowley admitted he shook M.R. for 15-20 seconds before dropping him face-down onto his crib mattress from approximately three feet above the mattress. After an unusually long nap, M.R. was still fussing and spitting up. Rowley gave M.R. a bath, during which M.R. quit breathing and became non-responsive. Rowley called 911. Emergency medical personnel responded but M.R. never recovered. Following his confession, Rowley was arrested on suspicion of felony injury to a child. Later that day, M.R. was taken off life support and pronounced dead. Rowley was indicted on one count of first degree murder.

Rowley filed a motion to suppress his confession to law enforcement. Rowley argued that, during the interview, "his will was overborne by the police conduct based upon a review of the totality of the circumstances." More specifically, Rowley asserted that the detectives "employed a deliberate and consistent" interview strategy to elicit a confession which consisted of minimizing the seriousness of the conduct being investigated while also assuring Rowley that people who tell the truth face lesser consequences. Rowley argued that the combined effect of these two strategies and the "repeated express and implied threats as well as promises from the detective, and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[Rowley's] particularly vulnerable psychological state" resulted in a confession that was involuntary under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and therefore, was inadmissible.

The State objected. First, the State argued the confession had none of the hallmarks of an involuntary confession because Rowley had been *Mirandized* and none of the other factors--age, education, length of the interview, the nature of the questioning, and food or sleep deprivation--were present. Second, the State argued Detective Pietrzak made no threats or promises to Rowley, did not misrepresent the law, and did not downplay the seriousness of the offense. Considering all the circumstances, the State argued Rowley's statements were voluntary.

The district court held a hearing on the motion at which audio recordings of the interview were admitted into evidence. Both detectives testified. The district court later ruled from the bench. The district court found that Rowley "knowingly, intelligently, and voluntarily waived his rights after being *Mirandized* and agreed to talk with law enforcement." The district court supported its finding by citing to Rowley's age, education, and mental status, all of which "indicate[d] that his confession was not coerc[ed]." The district court also found the length of the interview was not excessive, the interview techniques "were well within the bounds of acceptable police tactics," the detective did not misstate the law or minimize the import of seriousness of the situation, or "employ[] tactics which placed psychological, manipulation, or pressure" onto Rowley. As a result, the district court found Rowley's will was not overborne, his confession was not involuntary, and thus, denied the motion to suppress. Following trial, a jury found Rowley guilty of first degree murder. Rowley appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

3

## III.

## ANALYSIS

Rowley argues his written and oral statements were involuntary under the totality of the circumstances. According to Rowley, these circumstances are: (1) Rowley's psychological vulnerability; and (2) Detective Pietrzak's interrogation tactics. Specifically, Rowley argues that the time of the interview in the early morning hours, the fact that he had been awake for 17-24 hours, and his emotional stress given his child's medical condition, "illustrate [his] vulnerability during the interrogation." As to the alleged coercive interview tactics, Rowley argues that Detective Pietrzak's "interrogation tactic of minimization, misrepresentation of the seriousness of failing to make a full and truthful admission, and misrepresentation of the 'benefits' [Rowley] would receive for a confession" rendered Rowley's statements involuntary. Rowley argues his fragile emotional state, when combined with the alleged coercive interrogation tactics of the detectives, demonstrate that his will was overborne, and his statements were coerced, and therefore, inadmissible.

The State argues that none of the factors set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973), are present in this case, rendering Rowley's statements voluntary. Additionally, the State argues that even recognizing the *Schneckloth* factors are not exhaustive, nothing about the interview, including the interrogation tactics, rendered Rowley's statements involuntary, and thus, the district court did not err in denying Rowley's motion to suppress.

## A. Test for a Voluntary Confession

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Fifth and Fourteenth Amendments provide that no person shall be deprived of "life, liberty, or property, without due process of law." *Id.*; U.S. CONST. amend. XIV. If a confession is the product of coercion, it cannot be admitted for any purpose at trial, including for impeachment purposes, because any use of involuntary statements at trial violates due process. *Schneckloth*, 412 U.S. at 225-26; *see also State v. Moore*, 170 Idaho 783, 794-95, 516 P.3d 1054, 1065-66 (2022) (noting the defendant's statements must have been uncoerced and voluntary to be used for impeachment purposes).

To determine whether a confession is voluntary, a court must examine the totality of the circumstances and ask whether the defendant's will was overborne by police conduct. *State v. Valero*, 153 Idaho 910, 912, 285 P.3d 1014, 1016 (Ct. App. 2012). The conclusion that an

accused's will was overborne does not depend on the presence or absence of a single factor but instead requires careful scrutiny of all surrounding circumstances. *Schneckloth*, 412 U.S. at 226. In determining the voluntariness of a confession, a court should consider the characteristics of the accused and the details of the interrogation, including whether *Miranda* warnings were given, the youth of the accused, the accused's level of education or low intelligence, the length of the detention, the repeated and prolonged nature of the questioning, and the deprivation of food or sleep. *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (1993); *Valero*, 153 Idaho at 912, 285 P.3d at 1016. The presence or absence of *Miranda* warnings is a particularly significant factor. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) ("[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."). While one's "mental condition is surely relevant to an individual's susceptibility to police coercion," it cannot alone make a statement involuntary. *Colorado v. Connelly*, 479 U.S. 157, 165 (1986); *see also State v. Doe*, 131 Idaho 709, 713, 963 P.2d 392, 396 (Ct. App. 1998). If, under the totality of circumstances, the defendant's free will was overborne by threats, through direct or implied promises or other forms of coercion, then the statement is not voluntary and is inadmissible. *Valero*, 153 Idaho at 912, 285 P.3d at 1016. When a defendant alleges an interrogation is coercive, the State bears the burden of proving voluntariness of the defendant's confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, (1972); *State v. Yager*, 139 Idaho 680, 685, 85 P.3d 656, 661 (2004); *State v. Johns*, 112 Idaho 873, 878, 736 P.2d 1327, 1332 (1987).

1. ***Schneckloth* factors**

The district court addressed Rowley's claim that he was "susceptible to psychological pressure and manipulation" by the detectives. The district court found that a review of the *Schneckloth* factors demonstrated that Rowley's statements were voluntary. Rowley was twenty-two years old at the time of the interview, was a high school graduate of above-average intelligence, was given his *Miranda* warnings and understood those warnings, and the interview was approximately one and one-half hours long, with a break. After a review of the totality of the circumstances, the district court found that rather than Rowley being subject to psychological pressure or manipulation, "the opposite is established by the record." In other words, the district court found that based on all the circumstances, including the hour of the interview, the length of

time Rowley had been awake, and the medical condition of M.R., Rowley was not susceptible to psychological pressure and manipulation by the detectives.

Rowley concedes on appeal that he was given his *Miranda* warnings and that his age, education, intelligence, the length of his detention, or prolonged questioning did not contribute to any coerced statements. Rowley maintains however, the other conditions, considered in the totality of the circumstances, rendered his admissions involuntary. The only remaining *Schneckloth* condition is the deprivation of food or sleep. On that factor, Rowley does not argue he was deprived of food; consequently, the only applicable *Schneckloth* factor is whether Rowley was deprived of sleep. He was not.

Rowley stated he woke up around 5:00 a.m. on June 20. He then napped from approximately 7:00 a.m. until approximately 9:30 a.m. The interview occurred on June 21 at 2:00 a.m. That means Rowley was awake for approximately seventeen hours at the time of the interview. Even if Rowley had been awake, as he argues, for "17-24 hours," Rowley does not explain, or provide authority to explain, how this fact constitutes sleep deprivation. *See State v. Doe*, 137 Idaho 519, 524, 50 P.3d 1014, 1019 (2002) (holding a twelve-year-old who had been awake for approximately nineteen hours was not sleep deprived as contemplated in *Schneckloth*). Thus, the district court did not err in concluding that none of the *Schneckloth* factors weighed in favor of finding Rowley's confession was involuntary.

### 2. Rowley's emotional state

Rowley next argues his "fragile emotional state" contributed to the coercive nature of his statements because "he was unquestionably stressed and worried about his son," who was at that point, brain dead. Rowley argues that his emotional stress was noted at the beginning of the interview and at two other times when he was "clearly overcome with emotion."

We disagree with Rowley's characterization of his emotional state. First, Rowley's emotional state was part of the basis for the motion to suppress and argued by defense counsel at that hearing, but no evidence was presented in support of this factual allegation. Next, although the district court did not make any factual findings regarding Rowley's concern about the health of his child, it rejected the argument that Rowley's emotional state made him more susceptible to pressure during the interview. Instead, the district court found that, based on "the facts, the exhibits, the testimony, the briefing, and the attachments thereto," Rowley was not "susceptible to psychological pressure and manipulation" during the interview. Rowley does not challenge the

6

district court's factual finding that based on all factors, including Rowley's emotional state, he was not susceptible to psychological pressure during the interview, as clearly erroneous. As a result, the established, unchallenged fact is Rowley's emotional state did not make him susceptible to psychological pressure or manipulation during the interview. The record supports the district court's factual finding.

It is true that Detective Pietrzak noted the late hour, that Rowley may have had a lot on his mind, and that Rowley may have been distracted, but those factors, either individually or in the aggregate, do not demonstrate emotional fragility or that Rowley's will was overborne. It is also true that twice during the interview, Detective Pietrzak told Rowley to "take a deep breath" and to "relax." However, a review of the audio recording of the interview does not portray Rowley as being "clearly overcome with emotion" as he now suggests. Rowley makes no statements during the interview indicating that he is stressed, that he is "emotionally fragile," or that he is worried about his son. In fact, Rowley is remarkably even keeled during the entire interview, without any indication he was overcome with emotion as evidenced by Rowley's statements about M.R.'s medical status.

Rowley addressed M.R.'s medical status twice during the interview. At the beginning of the interview Rowley noted his son was brain dead and would be checked in the morning for any brain activity. Later during the interview, Rowley noted that if, in the morning, M.R. still had no brain activity, Rowley and his wife would have to consider removing M.R. from life support. In neither of these discussions does Rowley seem upset or even unduly disturbed. Instead, Rowley's statements throughout the interview indicate he is concerned about two things: his wife finding out what he did and whether he would go to jail. To the extent Rowley's argument about the involuntariness of his confession rests upon his alleged emotional state, the argument is not supported by the record. But even if it was, the district court considered that fact, and rejected the conclusion offered by Rowley.

Rowley acknowledges that the late hour and his emotional state, on their own, are likely insufficient to demonstrate his will was overborne. Instead, Rowley argues the fact that he had been up for 17-24 hours, combined with the time of the interview, "served to amplify [Rowley's] fragile emotional state." Because the record does not support Rowley's claim that he was in a "fragile emotional state," we disagree that Rowley being tired, even in conjunction with the time of the interview, created or exaggerated a "fragile emotional state" such that Rowley's will was

7

overborne during the interview. Because Rowley has failed to establish that he was in a "fragile emotional state," the only factors are Rowley's tiredness and the time of the interview, which Rowley concedes are insufficient to demonstrate his statements were given involuntarily. Thus, if the interrogation tactics were not coercive, then Rowley's confession was not involuntary.

### 3.     Interview tactics

Rowley argues Detective Pietrzak used three interrogation techniques which created a coercive environment. Rowley argues the detective: (1) minimized the seriousness of Rowley's conduct; (2) misrepresented the seriousness of failing to make a truthful statement; and (3) misrepresented the benefits and/or the repercussions Rowley would receive for his confession. The State responds that nothing about the interview demonstrates any coercion. The district court specifically found: (1) the "detective's comments were well within the bounds of acceptable police tactics in regards to this situation"; and (2) Detective Pietrzak "neither misstated the law nor minimized the import or the seriousness of the situation nor employed tactics which placed psychological, manipulation, or pressure onto [Rowley]."

"If the defendant's free will is undermined by threats or through direct or implied promises, then the statement is not voluntary and is inadmissible." *Valero*, 153 Idaho at 912, 285 P.3d at 1016. However, "[d]eceptive police practices do not necessarily create coercion which would render a suspect's subsequent confession involuntary and excludable"; for example, "[c]onfessions derived during the course of interrogations have been upheld as voluntary, notwithstanding misrepresentations of facts by the police." *Valero*, 153 Idaho at 912, 285 P.3d at 1016.

In *Valero*, the police interviewed Valero regarding a report that he had inappropriately touched a fifteen year old. *Id*. at 911, 285 P.3d at 1015. During the interview, Valero acknowledged he was free to leave at any time and his participation in the interview and subsequent polygraph examination was voluntary; Valero was given his *Miranda* warnings. *Id*. Valero made incriminating statements during the post-polygraph interview and was charged with sexual abuse of a child and lewd conduct with a child. *Id*. Valero filed a motion to suppress his statements, and the district court suppressed Valero's statements on the basis that the detective's interview tactics overbore Valero's will. *Id*. The State appealed.

This Court affirmed the district court's order suppressing Valero's statements. *Id*. We held that none of the *Schneckloth* factors regarding Valero's characteristics weighed in favor of finding his statements were involuntary. *Id*. at 912, 285 P.3d at 1016. We also held several details

8

of the interrogation did not weigh in favor of finding Valero's statements were involuntary, including that Valero was provided *Miranda* warnings, he understood waiving those rights, his appearance at the police station was voluntary, and the length of the interview was approximately three and one-half hours. *Id*.

However, this Court held the interview tactics were coercive. First, the officer represented that the offense being investigated was a "minor issue." *Id*. at 914, 285 P.3d at 1018. Second, the detective mispresented the law by telling Valero the polygraph would be admitted in court. *Id*. Third, the officer mispresented his ability to testify against Valero and made "quasi-factual, quasi-legal misrepresentations regarding the polygraph itself." *Id*. Fourth, the detective also implied that he could make the matter go away if Valero told the truth. *Id*. Fifth, and "most critically," the officer represented that lying to the police was a separate and more serious crime than the conduct being investigated. *Id*. at 916, 285 P.3d 1020.

This case has some limited similarities to *Valero*. For example, like in *Valero*, none of Rowley's personal characteristics weigh in favor of finding Rowley's statements were involuntary. Second, several details of the interview, including that Rowley was *Mirandized*, his waiver of those warnings, his voluntary attendance at the interview, and the relatively short length of the interview, also weigh against finding his statements were involuntary. However, unlike in *Valero*, Detective Pietrzak did not misrepresent any facts or the law. Detective Pietrzak did not imply or represent that he had the authority to affect the charges; did not imply that the offense for which Rowley was being investigated would be resolved if Rowley confessed; did not promise leniency in exchange for Rowley's confession; and did not imply there was an additional crime of lying to the police. As to any explicit benefit discussed, that benefit was Rowley's opportunity to describe the events in his own words if he made a written confession, a benefit he received. As to any implied benefit, Detective Pietrzak may have implied Rowley would "feel better" after disclosing what happened. And Rowley also received that benefit, as he agreed he felt better after writing and telling Detective Pietrzak what happened.

### a. Minimization

Rowley argues Detective Pietrzak's minimization of the seriousness of Rowley's conduct is "strikingly similar" to the tactic used by the detective in *Valero*. The State argues there was no minimization, and the detective did not use a "false equivalency" to compare the crime being investigated to the crime of running a red light.

9

In *Valero*, this Court held the officer's comments were coercive because the officer "downplay[ed] [] the seriousness of the victim's accusations to juxtapose that alleged crime against a threat of being charged with a more serious crime of lying to the police, which the officer could prove 'one hundred percent' because the polygraph established Valero was lying." *Id*. at 915, 285 P.3d 1019. The juxtaposition between Rowley's conduct and the separate crime of lying to the police is not present in this case.

Rowley points to a hypothetical posed by Detective Pietrzak in which an officer in a marked police car runs a red light in a busy area at 2:00 a.m. and no other cars are around. After posing the hypothetical, the detective discusses with Rowley different scenarios--the officer telling the truth or not telling the truth about what happened and the consequences under either scenario. Rowley argues that equating his conduct to running a red light minimized his conduct.

The district court concluded that Detective Pietrzak was not "attempting to equate whatever happened . . . with [M.R.] and what possible offense could result from that in any way equated to running a red light." We agree. Detective Pietrzak's hypothetical example about running a red light did not equate Rowley's conduct to that of the officer running the red light. That Detective Pietrzak was not comparing Rowley's actions towards M.R. to running a red light was made even more clear when Detective Pietrzak explained to Rowley that his actions towards M.R. were on a scale somewhere between spanking or slapping and torture, and that what would happen to Rowley would be determined by the courts.

As the district court found, the detective was simply illustrating how lying about an event can make the consequences worse. The district court correctly concluded that the "red light" hypothetical was an example rather than a coercive tactic designed to overcome Rowley's will such that Rowley was unable to terminate the interview or indicate he no longer wished to speak to the detective. Even if Detective Pietrzak's statements arguably minimize Rowley's behavior, the fact that an officer downplays the seriousness of a situation does not make a confession involuntary if the suspect was aware of the seriousness of the situation. *State v. Smith*, 162 Idaho 878, 884, 406 P.3d 890, 896 (Ct. App. 2017); *Valero*, 153 Idaho at 916, 285 P.3d at 1020.

Here, Rowley was well aware of the seriousness of the situation. He knew that M.R. had no brain activity and Rowley and his wife would likely have to decide to remove life support. Rowley was told his statements could be used against him and that this was a criminal investigation. He was also told that any statement he wrote would be attached to the reports and

10

forwarded to other individuals, and that what would happen to him would be left to the court. After explaining that he tipped M.R. over in his infant seat, Rowley asked if he was going to jail. Detective Pietrzak replied, "We don't know what's going to happen yet." Nothing suggests that Rowley was unaware of the seriousness of the situation, and to the extent Detective Pietrzak downplayed the seriousness of the offense, it did not amount to coercion.

Rowley also takes issue with Detective Pietrzak's statements that the detective wanted to resolve everything "at the lowest level." At the beginning of the interview, Detective Pietrzak told Rowley, "and we're going to get things resolved at the lowest level, and we're not going to have any issues going forward. But to protect everybody in the room, you can understand why we want to do that, right?" Rowley indicated he understood, and he was then *Mirandized*. When Rowley later wondered how the process worked and what would happen, Detective Pietrzak replied:

> Well, we want to resolve things at the lowest level. I have no desire to make something bigger out of something small. But when people make the decisions that they have, you know, the decisions that they have to make, they make that with the information that they have. And we're just trying to get the best information so we can make the best decision.

Later, Detective Pietrzak stated:

> I need you to tell me what really happened with you and [M.R.] today because I know what you told me, you're leaving some things out . . . . I understand that no one woke up this morning wanting to hurt [M.R.] I understand that. No one knows that better than me.
> But I also know that [M.R.] got hurt, and he was in your care today. And right now, you're somewhere on a scale. Right? You know what that's all about?

Detective Pietrzak then explained that Rowley's actions were something more than a spanking but less than torture. The detective also told Rowley they needed to put him on the scale stating, "And the only way we can do that is by getting you to understand you had a bad day and things got out of control for you today. That's what we need to do. Get this resolved at the lowest level. Don't let people put you over here," indicating that Rowley would not want to be perceived as someone who tortured his son to death. After Rowley made some relatively innocuous admissions, Detective Pietrzak indicated he did not think Rowley was being completely honest, that Rowley was at "a fork in the road," and then referenced the "red light" hypothetical, clarifying that Rowley was making some admissions but not disclosing the complete story.

11

At the motion to suppress hearing, the district court specifically referenced the detective's statement about resolving things at the "lowest level," but explained the context demonstrated that only applied if there were no injuries. The district court stated:

> if something in relation to a situation as this involving a child is explainable and reasonable, a matter can be resolved at the lowest level. But [the detective] further explained to [Rowley] that if it's not explainable and reasonable, the detective said we have no choice but what we need to do.

The district court concluded that this did not amount to coercive minimization as the "lowest level" statement was premised on no harm occurring. Detective Pietrzak made clear that if there was harm, the "lowest level" would not apply, and it would be left to the courts what would happen. The district court found the seriousness of this offense was "visible and observable" to Rowley and that in context, what was being explained to Rowley was clear. We agree.

### b. Misrepresentation

Rowley also argues the purpose of the "red light" hypothetical was to emphasize that lying was the more serious crime." The district court referenced the "red light" hypothetical and noted, "the clear import of what the detective is explaining is that a lie can create a bigger problem than just simply telling the truth. It can make a situation worse."

Unlike in *Valero*, Detective Pietrzak never stated or implied to Rowley that lying was a crime. Detective Pietrzak never indicated or stated that the officer in the "red light" hypothetical who was untruthful committed "the more serious crime" of lying. While it is true Detective Pietrzak indicated there would be consequences for failing to be truthful, nowhere in the interview does he say that lying about one's actions is a separate, and more serious, crime than the actions being investigated.

Rowley next argues that after indicating lying was the more serious crime, Detective Pietrzak "ensured that [Rowley] would believe telling the truth absolves *any* criminal behavior" by using various examples. A review of the transcript does not support Rowley's argument. First, Detective Pietrzak provided *Miranda* warnings to Rowley, which clearly indicated any statements could be used against him. Second, as discussed above, Detective Pietrzak made clear that the court would be the one to decide what happened. Third, prior to Rowley writing down his confession, Detective Pietrzak told Rowley, "Yeah, we don't decide what to do. I mean, as far as--I mean, this is a criminal investigation. You understand that; right?" Rowley indicated he understood. Rowley asked what would happen to his written statement and Detective Seavey told

12

him it would be attached to the report. Even when discussing the "red light" hypothetical, Detective Pietrzak made clear that if "someone gets hurt or something egregious" happens, the officer who ran the red light would be held responsible. Rowley has not established that he did not understand this analogy or that he believed he would be absolved of all consequences if he explained what happened. We agree with the district court that the context of this discussion was to explain that lying creates bigger problems than telling the truth, not to emphasize or imply that lying was a crime or a more serious crime than the conduct being investigated.

### c. Benefit

"Promises made by law enforcement officers without the authority to fulfill such promises" may indeed "render a confession involuntary." *Valero* at 915, 285 P.3d at 1019. However, where an officer makes a "vague assurance[] of leniency," "not connected to a promise of a specific benefit"--such as a promise of a "specific sentence"--a confession is not coerced. *State v. Stone*, 154 Idaho 949, 954, 303 P.3d 636, 641 (Ct. App. 2013); *see Smith*, 162 Idaho at 885, 406 P.3d at 897 ("A confession can also be rendered involuntary by an officer's false promises, either express or implied. For instance, if an officer represents that he has the authority to affect the charges brought against the defendant or promises leniency in return for the truth, a confession may be deemed involuntary.").

After Rowley made some admissions, Detective Pietrzak told Rowley his statements were not consistent with M.R.'s injuries and without Rowley's complete honesty, "[P]eople aren't going to be able to resolve this and give you a benefit; right?" Rowley argues that his next statement about not understanding what was happening and his subsequent question, "what's going to happen to me?" indicates, "Clearly [Rowley] was feeling extreme pressure to choose correctly at the 'fork in the road' to ensure he received the 'benefit' of having his conduct 'resolved at the lowest level.'" We disagree with Rowley's characterization. Rowley's expressed concerns about what would happen to him are not "clearly" linked to coercive pressure to confess so that he would obtain a benefit. Nothing about Rowley's statements at this point in the interview, or at any other point in the interview, demonstrate Rowley was feeling "extreme pressure" to confess to obtain a benefit.

As to Rowley's written statement, Detective Pietrzak made clear that the written statement was completely voluntary, that it would not change the outcome one way or another, and that "I just told you before that I would give you every benefit; right? And that's one of the things we

offer people." The "thing" being offered--the "benefit"--was that Rowley would have the opportunity to describe what happened in his own words. As Detective Pietrzak testified, "I am giving him the opportunity to write in his own words; right? Not everyone gets that chance." That benefit was provided to Rowley.

To the extent any benefit of confessing was implied, Detective Pietrzak testified that he was referring to the possibility of understanding from family members and perhaps a lesser sentence if Rowley was truthful about what happened. Viewed in the context of the entire interview, the detective's statement "[P]eople aren't going to be able to resolve this and give you a benefit; right?" was nothing more than a vague promise of leniency and it was a correct statement of the law, as accepting responsibility for one's actions can be mitigating evidence at sentencing. *See Smith*, 162 Idaho at 884, 406 P.3d at 896 (noting "courts give great consideration to lack of remorse and refusal to recognize culpability during sentencing because these factors play an important role in the court's determination of the rehabilitative potential of a defendant" and that "lack of remorse has led to the imposition of maximum sentences").

And in terms of easing his conscience, a review of the transcript shows Rowley did feel better after explaining what happened. When he completed his written statement, Detective Pietrzak came back into the room and after the detective asked a few clarifying questions, Rowley thanked the detective for "pushing" him and indicated that making the confession "feels good" and he felt better "getting some of that stuff out." The detective telling Rowley he would feel better after he described what occurred in his own words was not a false promise because Rowley received the benefit discussed--he had the opportunity to describe the events in his own words and he felt better after making the statement. This does not rise to the level of coercion or demonstrate Rowley's will was overborne and his statements were involuntary.

Ultimately, the district court held that the State established by a preponderance of the evidence that Rowley knowingly, intelligently, and voluntary waived his Fifth Amendment rights after being *Mirandized* and agreed to talk with the detectives. The district court went on to conclude that considering the totality of the circumstances, including the *Schneckloth* factors and the interview tactics, Rowley's confession was not coerced because Rowley was not subjected to psychological pressure and there was no coercion that would render Rowley's confession involuntary. The district court did not err in denying Rowley's motion to suppress.

## IV.

## CONCLUSION

The district court did not err in concluding Rowley's confession was voluntary and correctly denied Rowley's motion to suppress. The denial of Rowley's motion to suppress and Rowley's judgment of conviction for first degree murder are affirmed.

Chief Judge TRIBE and Judge LORELLO, **CONCUR**.